APR 2 2026 PM4:05
FILED - USDC - FLMD - TPA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DANIEL BENJAMIN FLEISCHMAN,

    *Plaintiff,*

                                  Case No. 8:25-cv-02479-WFJ-TGW

v.

THE SCHOOL BOARD OF POLK COUNTY,
FLORIDA, and FREDERICK HEID, in his
official capacity as Superintendent,

    *Defendants.*

---

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE
UNDER FEDERAL RULE OF EVIDENCE 201**

---

Plaintiff Daniel Benjamin Fleischman, proceeding *pro se*, respectfully requests that this Court take judicial notice, pursuant to Federal Rule of Evidence 201, of the following official policies of The School Board of Polk County, Florida, and related public records. These materials are submitted as Exhibits G through M to this filing.

**I. LEGAL STANDARD**

Federal Rule of Evidence 201(b) provides that a court may judicially notice a fact that is "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Courts routinely take judicial notice of official government policies published on government-maintained websites and platforms. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (courts may take judicial notice of public records); *Universal*

*Express, Inc. v. SEC*, 177 F. App'x 52, 53 (2d Cir. 2006) (judicial notice of government records on official websites).

Under Rule 201(c)(2), a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." The policies identified below are published on the Neola policy management platform (files.neola.com/polk-fl/), which is the authoritative policy content system for The School Board of Polk County, Florida, and on the parallel BoardDocs interactive portal (go.boarddocs.com/fl/polk/Board.nsf/Public). Their existence and content are not subject to reasonable dispute.

## II. MATERIALS FOR JUDICIAL NOTICE

Plaintiff requests judicial notice of the following seven official policies and one public interlocal agreement:

**Exhibit G: Policy 9800 – CHARTER SCHOOLS.** Establishes that the School Board has "oversight responsibility for all charter schools situated within Polk County" under F.S. 1002.33, with "final authority, by majority vote" over charter applications and contracts, and the power to immediately terminate any charter upon a written finding of "immediate and serious danger to the health, safety, or welfare of the charter school's students." Section E.6 addresses the application of Board policies to charter schools. Adopted November 12, 2013; last revised January 22, 2019.

**Exhibit H: Policy 9150 – SCHOOL VISITORS.** Vests campus control in the Principal, who has authority to "prohibit the entry of any person to a school of this District or to expel any person when there is reason to believe the presence of such person would be detrimental to the good order of the school." Explicitly references F.S. 810.097 (trespass on school property).

Requires that all visitors receive permission from the Principal, sign in/out, and wear a visitor's nametag. Adopted November 12, 2013; last revised January 22, 2019.

**Exhibit I: Policy 8405 – SCHOOL SAFETY AND SECURITY.** Establishes the School Safety Specialist role with "supervision and oversight for all school safety and security personnel, policies, and procedures in the District." Mandates threat assessment teams at each school in the District, annual security risk assessments using the Florida Safe Schools Assessment Tool, and the District Active Assailant Response Plan. Adopted November 12, 2013; last revised July 30, 2019.

**Exhibit J: Policy 8407 – SAFE-SCHOOL OFFICERS.** Provides in its first operative sentence that the District shall "establish or assign one or more safe-school officers at each school in the District, including charter schools." Directs the Board to "collaborate with charter school governing boards located in the District to facilitate access to all safe-school officer options available pursuant to Florida law." Adopted September 4, 2018; last revised July 30, 2019.

**Exhibit K: Policy 8141 – MANDATORY REPORTING OF MISCONDUCT BY CERTIFICATED EMPLOYEES.** Requires mandatory reporting to the Superintendent of alleged misconduct by District employees affecting the health, safety, or welfare of a student. Prohibits confidentiality agreements regarding terminated or dismissed personnel based on misconduct affecting student welfare. Requires reassignment of staff pending misconduct investigation. Adopted November 12, 2013; unchanged since adoption.

**Exhibit L: Policy 5780.01 – PARENTS' BILL OF RIGHTS.** Establishes parental rights pursuant to Florida Statutes, including the right to educational choice, access to school and

medical records, and notification requirements. Provides that parents have an equal right to visit their students at school and make educational decisions unless a court order provides otherwise.

**Exhibit M: Interlocal Agreement Between the Polk County Sheriff's Office and The Schools of McKeel Academy, Inc. (Filed June 4, 2018).** Public record filed with the Clerk of Circuit Court of Polk County on June 4, 2018, establishing the School Guardian Program for McKeel Academy campuses under the Marjory Stoneman Douglas High School Public Safety Act. Demonstrates the operational integration between the Polk County Sheriff's Office and McKeel Academy for school safety purposes, and the institutional relationship between these entities.

### III. RELEVANCE TO PENDING MOTION TO DISMISS

These policies are directly relevant to the pending Motion to Dismiss (Dkt. 15) and Plaintiff's opposition thereto. Defendants have argued that the School Board is the "wrong defendant" because McKeel Academy, as a charter school, operates independently. The policies identified above demonstrate the opposite: the School Board's own official policies establish an ongoing operational nexus between the Board and charter school safety matters that extends well beyond mere "sponsorship."

**Specifically:**

- Policy 9800 vests the Board with oversight responsibility over all charter schools and grants the Board power to immediately terminate a charter upon finding danger to student welfare—demonstrating the Board retains ultimate authority over charter school safety.

- Policy 8407 expressly applies safe-school officer requirements to charter schools by name—establishing that the Board's safety policies are not optional for charter schools but mandatory by the Board's own terms.

- Policy 8405 gives the School Safety Specialist district-wide authority over all school safety personnel, policies, and procedures, and mandates threat assessment teams at each school—including charter schools within the District.

- Policy 9150 vests trespass authority in the Principal under Board policy—meaning the December 9, 2024 trespass warning against Plaintiff was issued pursuant to Board-derived authority, not independent charter school discretion.

- Policy 8141 creates mandatory reporting obligations for misconduct affecting student welfare and prohibits confidentiality agreements—obligations that bear directly on the institutional response to Plaintiff's child safety concerns.

- The Interlocal Agreement between the Polk County Sheriff's Office and McKeel Academy establishes that McKeel's school safety infrastructure operates through institutional relationships with Polk County entities, further demonstrating the operational integration that Defendants seek to disclaim.

Taken together, these policies establish that the School Board's own written policies create the very operational nexus that supports *Monell* liability under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). Superintendent Heid's post-notice enforcement of the trespass warning—after receiving and reviewing Plaintiff's safety complaints through District channels—constitutes a ratifying decision by a final policymaker acting under the authority structure these policies create.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court take judicial notice of the above-identified policies and public records pursuant to Federal Rule of Evidence 201(b)(2) and (c)(2).

Respectfully submitted,

**Daniel Benjamin Fleischman**
*Pro Se Plaintiff*
4885 McKnight Road #123
Pittsburgh, PA 15237
Tel: (724) 462-5730
Email: OperationReunification@gmail.com

Dated: April 2, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2026, I served a true and correct copy of the foregoing

Plaintiff's Request for Judicial Notice Under Federal Rule of Evidence 201, together with all

exhibits, upon all counsel of record by electronic mail as follows:

**Jeffrey Sullivan, Esq.**
**Jonathan Stidham, Esq.**
Stidham & Stidham, P.A.
Bartow, Florida
*Counsel for Defendants School Board of Polk County and Frederick Heid*

**Braxton Padgett, Esq.**
Arnold Law Firm
Jacksonville, Florida
*Counsel for McKeel Academy*

Daniel Benjamin Fleischman
*Pro Se Plaintiff*

# Polk County School Board Policy Exhibits for Fleischman v. PCSB

**Five of six requested policies have been retrieved in full verbatim text** from the official Neola policy management platform (files.neola.com/polk-fl/), which is the authoritative policy content system for The School Board of Polk County, Florida. The McKeel Academy charter contract is not publicly available online. A critical note: the Neola-hosted version of Policy 9800 shows a last revision date of **1/22/19**, not December 9, 2025 as referenced—counsel should verify whether a more recent version exists on the BoardDocs portal or through the district policy office, as the BoardDocs interactive system blocks automated retrieval.

---

## How to access and authenticate these policies

All policies are published on two parallel platforms. **Neola** (files.neola.com/polk-fl/) hosts the policy content as static HTML pages—this is the same content engine behind the BoardDocs interface. **BoardDocs** (go.boarddocs.com/fl/polk/Board.nsf/Public) provides the interactive portal where the School Board publishes its official policy manual. Both platforms carry the standard header: *"Unless a specific policy has been amended and the date the policy was revised is noted at the bottom of that policy, the bylaws and policies of The School Board of Polk County were adopted on November 12, 2013 and were in effect beginning November 12, 2013."* (neola) (neola)

For court exhibit purposes, counsel should consider authenticating these policies by either: (1) printing directly from the BoardDocs portal with a certification from the district's records custodian, or (2) obtaining certified copies from the Polk County School Board's Office of Charter Schools at 1915 S. Floral Ave, Bartow, FL 33830 (863-534-0625). (Polk County Public Schools)

---

## Policy 9800 — CHARTER SCHOOLS

**Full Title:** 9800 - CHARTER SCHOOLS **Code:** po9800 **Section:** 9000 Community Relations **Original Adoption:** November 12, 2013 **Revision History:** Revised 10/28/14; Revised 11/15/16; Revised 1/22/19 **Neola Copyright:** © Neola 2018 **Source URL:** https://files.neola.com/polk-fl/search/policies/po9800.htm

> ⚠ **IMPORTANT NOTE FOR COUNSEL:** The user referenced a revision date of December 9, 2025, which would add references to Policies 8405 and 8407 and require charter school coordination with the District's School Safety Specialist. The publicly accessible Neola version below does **not** contain these specific cross-references, suggesting a more recent revision exists on the BoardDocs portal or was adopted at a December 2025 board meeting.

Counsel should obtain the current version directly from the district or the BoardDocs interface.

**Complete verbatim text:**

**9800 - CHARTER SCHOOLS**

F.S. 1002.33 empowers the School Board with oversight responsibility for all charter schools situated within Polk County. The Board designates the Superintendent to receive and review all charter applications. The Superintendent shall recommend to the Board the approval or denial of each charter application and charter contract as required by State law. The Board shall have final authority, by majority vote, to approve or deny any application and charter contract. (Neola)

Approved charter schools are public schools and shall receive goods and services from the Board as required by law and/or specified through a contract with the Board. (Neola)

If approved, the initial charter shall be for a term of five (5) years, excluding two (2) planning years. The Board may renew charters under the conditions and for terms as set forth in State law. (Neola)

In addition, a charter school that satisfied the requirements set forth in State law for designation as a high-performing charter school may receive a modification of its term to fifteen (15) years or a fifteen year (15-year) charter renewal. The charter may be modified or renewed for a shorter term at the option of the high-performing charter school.

The Board shall enter into a charter with a charter operator and the focus is on three (3) areas of charter school operation: academic accountability, fiscal management, and governance. The Board, as sponsor, shall perform the duties provided in F.S. 1002.33.

Student academic achievement for all students is the most important factor when determining whether to renew or terminate a charter. Additionally, the Board has the right to non-renew or terminate any charter if the Board finds that one (1) of the following grounds exists by clear and convincing evidence:

A. fails to participate in the State's education accountability system created in F.S. 1008.31, or fails to meet the requirement for student performance as specified in the charter;

B. fails to meet generally accepted standards of fiscal management;

C. materially violates the law;

D. materially breaches the charter, as described in State law; and/or

E. for other good cause shown.

**Application Procedure**

Potential applicants should send letters notifying the Board of their intent to submit an application to open a public charter school not later than July 1st. Such correspondence should be directed to the Office of Charter Schools. Failing to send the letter of intent will in no way negatively impact the application. Potential applicants are encouraged to participate in the District-sponsored orientation program prior to filing their application.

**Final Charter School Application**

Final applications for a public charter school no later than 4:00 p.m. on the submission deadline of February 1st. If the submission deadline falls on a non-business day, the deadline shall be postponed to 4:00 p.m. on the next business day. Applications may be mailed or hand delivered but receipt by the Board must be on or before the deadline.

Beginning in 2018 and thereafter, the District shall receive and consider applications received on or before February 1st of each calendar year for charter schools to be opened eighteen (18) months later at the beginning of the District's school year, or to be opened at a time determined by the applicant. The District will not refuse to receive an application submitted before February 1st will not accept applications received later than February 1st.

The following pertains to the submission of a final application:

A. An individual, teachers, parents, a group of individuals, a municipality, or a legal entity organized under the laws of this State anticipating submission of an application are urged to contact the District's Office of Charter Schools for an application packet prior to the application deadline. Applicants who are planning to submit a proposal should send a letter of intent to the Office of Charter Schools on or before the first working day in December.

B. Charter school applicant must participate in training provided by the Florida Department of Education (FLDOE) before filing an application, unless they have participated in qualified training provided by the District.

C. The Board and/or any of its designees shall not take unlawful reprisal against another Board employee because that employee is either directly or indirectly involved with a charter school application.

D. Applicants must submit an application on the FLDOE's Standard Florida Charter School Application template and forms. A single application is required for each site with any grade configuration within Pre-K through grade eight. A separate application must be submitted for any grade configuration within grades nine through twelve and/or postsecondary grade configurations.

E. The Board shall not charge any fees for processing or consideration of a final charter school application. The Board's approval of a charter shall not be predicated on the promise of any future pay of any kind.

F. The applicant and Board may mutually agree, in writing, to extend the statutory timeline to consider the charter application. Such agreement shall detail the extension date or timeframe.

G. Charter schools shall not use or bear the name of an existing traditional public, charter, or private/parochial school in Polk County.

Applications shall be submitted to:
The Office of Charter Schools
The School Board of Polk County
1915 S. Floral Avenue
Bartow, Florida 33830

The Board shall review all applications using the evaluation instrument developed by the FLDOE. (Neola)

## Application Contents

A. State Application Form — Applications must be submitted using the Standard Charter School Application form developed and distributed by the FLDOE.

B. Statement of Assurances — Applicants are required to sign under the penalties of perjury the Statement of Assurances form contained within the Standard Charter School Application developed and distributed by the FLDOE, thereby attesting to the following:

1. The charter school will be nonsectarian in its programs, admission policies, employment practices, and operations.

2. The charter school will enroll any eligible student who submits a timely application, unless the school receives a greater number of applications than there are spaces for students, in which case students will be admitted through a random selection process.

3. The charter school will adhere to the anti-discrimination provisions of F.S. 1000.05.

4. The charter school will adhere to all applicable provisions of State and Federal law relating to the education of students with disabilities, including the Individuals with Disabilities Education Act; Section 504 of the Rehabilitation Act of 1974; and Title II of the Americans with Disabilities Act of 1990.

5. The charter school will adhere to all applicable provisions of Federal law relating to students who are limited English proficient, including Title VI of the Civil Rights Act of 1964 and the Equal Educational Opportunities Act of 1974.

6. The charter school will participate in the Statewide assessment program created under F.S. 1008.22.

7. The charter school will comply with Florida statutes relating to public records and public meetings, including F.S. Chapter 119 and F.S. 286.011 which are applicable to applicants even prior to being granted a charter.

8. The charter school will obtain and keep current all necessary permits, licenses, and certifications related to fire, health, and safety within the building and on school property.

9. The charter school will provide for an annual financial audit in accordance with F.S. 218.39.

C. Proposed Contracts for Services — Applicants anticipating a request for District services (i.e., transportation, payroll services, use of facilities, etc.) must include a proposed contract for each service desired.

## Application Evaluation Process

A. The District shall receive and review all final applications using an evaluation instrument developed by the FLDOE.

B. The Board shall evaluate all timely final applications as submitted. During the evaluation process, 1) applications cannot be amended and 2) missing documentation and unsolicited information will not be accepted or considered. However, as required by law, the Board shall allow the applicant, upon receipt of written notification, seven (7) calendar days to make technical or nonsubstantive corrections and clarifications, including, but not limited to corrections of grammatical, typographical, and like errors or to add missing signatures, if such errors are identified as cause to deny the final application.

C. The Board shall deny any final application that does not comply with the statutory requirements and/or Board's instructions for charter school applications.

D. Additional Information

1. The Board may solicit information regarding 1) history and background of individual applicants and/or founding/governing boards and its individual members including, but not limited to, a demonstration of the professional experience or competence of those individuals or organizations applying to operate the charter school or those hired or retained to perform professional services; and 2) the description of clearly delineated responsibilities and the policies and practices needed to effectively manage the charter school. A description of internal audit procedures and establishment of controls to ensure that the financial resources are properly managed must be included. This information may be used to evaluate the applicant's ability to operate a charter school.

2. The Board may solicit additional information during the review and evaluation of the final charter school application such as whether the applicant currently operates charter schools in Florida and if the proposed school will be a replication of an existing school design. This information may be used to evaluate the applicant's ability to operate a charter school.

3. The applicant may provide evidence of prior experience in establishing and operating public charter schools. Evidence of prior experience and success in establishing and operating charter schools shall be weighed in making a determination to recommend approval or denial of a final application.

4. The charter review team may raise specific questions in its review process that clarify a particular point in the final application. These specific questions and answers will be considered as part of the superintendent's review and decision making process. If the charter review team identifies sections of the final application that are missing, inaccurate or incomplete, additional submittals to address these deficiencies will not be considered as part of the review process.

E. Charter Review Team (CRT) — The purpose of this team is to identify deficiencies in the written final application and/or areas that require clarification to fully evaluate the quality of the final application or the capacity of the group to properly implement the proposed plan.

The CRT shall be comprised of members of the Superintendent's executive staff or their appropriate designees, school principals and other administrators from the following areas of expertise: 1) School Based Operations; 2) Curriculum and Instruction, including, but not limited to, K-12 reading, math, and science; 3) Officer of Charter Schools (non-voting); 4) Facilities; 5) Business Services; 6) Human Resource Services; 7) Learning Support; 8) Information Systems and Technology; 9) Support Services; 10) Assessment, Accountability, and Evaluation; 11) English Speakers of Other Languages; 12) Regional Assistant Superintendent Representative; 13) General Counsel (non-voting); 14) Discipline; 15) Diversity Management; 16) Existing Charter School Principal/Director; and 17) Up to three (3) community members to be appointed by the Board.

An external consultant may be contracted to facilitate the team's work. A majority of the entire membership constitutes a quorum for voting purposes.

Applicants shall be notified and given the opportunity to attend an applicant interview. This purpose of the interview is to ascertain the level of knowledge and overall preparedness to open a charter school exhibited by the founding board and the school's director (if named) and, as such, a total of three (3) persons may attend this interview on behalf of the charter school. No more than one (1) interviewee may be a management company representative and/or consultant. Attorneys may be in attendance but are not respondents or part of the interview. Information provided during these interviews will be shared with the CRT, the Diversity Council, the Superintendent, and the Board.

The applicant will be encouraged to have at least one (1) governing board member present. The CRT may, at its sole discretion, evaluate the application without any additional input from the applicant if at least one (1) governing board member of the charter school is not available for the applicant interview.

By majority vote, the CRT shall make a recommendation to the Superintendent to approve or deny each application.

All applications will be submitted to the Board by the Superintendent with a recommendation for approval or denial no later than ninety (90) calendar days after the final application is received, unless the applicant and the Board mutually agree, in writing, to postpone the vote to a specific date, at which time the Board shall approve or deny the final application.

An application submitted by a high-performing charter school that has satisfied the requirements set forth in State law for such designation or a high-performing charter school system as set forth in F.S. 1002.332 may be denied by the Board only if the Superintendent demonstrates by clear and convincing evidence that the application failed to meet one (1) or more of the criteria set forth in F.S. 1002.33(6)(b)(3)(b):

1.  The application of a high performing charter school does not materially comply with the requirements set forth in F.S. 1002.33(3)(a) or, for a high performing charter school system, the application does not materially comply with F.S. 1002.332(2)(b).

2.  The charter school proposed in the application does not materially comply with the requirements in F.S. 1002.33(9).

3.  The proposed charter school's educational program does not substantially replicate that of the applicant's high-performing charter school.

4.  The applicant has made a material misrepresentation or false statement or concealed an essential or material fact during the application process.

5.  The proposed charter school's educational program and financial management practices do not materially comply with the requirements of F.S. 1002.33.

If the Board denies an application submitted by a high-performing charter school or a high-performing charter school system, the specific reasons, based upon the criteria set forth in F.S. 1002.33(3)(b), for the denial shall be provided in writing to the applicant and the FLDOE within ten (10) calendar days after such denial.

**Appeal of a Decision to Deny an Application**

Pursuant to State law, an applicant may, no later thirty (30) calendar days after receiving the Board's final order denying an application or upon the Board's failure to act on an application, appeal the Board's decision to the State Board of Education. The applicant shall notify the Board of the appeal. (Neola)

Such appeals shall be conducted in accordance with F.S. 1002.33(6) and applicable State Board rules. (Neola)

In accordance with State Board rule, the State Board of Education shall by majority vote accept or reject the decision of the Board no later than ninety (90) calendar days after the appeal is filed. The State Board of Education shall remand the application to the Board with its written decision that the Board approve or deny the application. The Board shall implement the decision of the State Board of Education. (Neola) The decision of the State Board of Education is not subject to the provisions of the Administrative Procedure Act.

If the Board denies an application submitted by a high-performing charter school or a high-performing charter school system, the Board shall, within ten (10) calendar days after such denial, state in writing the specific reasons, based upon the criteria of F.S. 1002.33 supporting its denial of the application and must provide the letter of denial and supporting documentation to the applicant and to the Department. The applicant may appeal the Board's denial of the application in accordance with F.S. 1002.33.

## Renewal Procedure

Documents for renewing charter contracts will be accepted no later than 5:00 p.m. on the first working day in November of the last year of the charter.

The following pertains to the submission of a renewal document:

A. The governing body of the charter school shall submit a completed copy of the Department of Education's Charter Renewal format to the Board.
B. The renewal format will be made available to the charter school on or before the last working day in July of the final year of the charter.
C. A renewal charter's focus should rest on demonstrated, documented performance.
D. The applicant and Board may mutually agree, in writing, to extend the deadline to submit a renewal document. Such agreement shall detail the extension date or timeframe.

## Five (5) Year Performance Review

Any school whose contract is more than five (5) years in length will participate in a review to demonstrate and document their success in achieving student performance goals as agreed to in the school's individual charter contract at the end of each five (5) year term. Documentation must be received by the Office of Charter Schools no later than 5:00 p.m. on the first working day in July of the fifth and tenth year of each charter.

## Appeal of a Proposed Termination or Nonrenewal of a Charter

At least ninety (90) days before renewing, non-renewing, or terminating a charter, the Board shall notify the charter school's governing board in writing of its proposed action. The notice shall state in reasonable detail the grounds for the proposed action and stipulate that the charter school's governing board may, within fourteen (14) calendar days after receiving the notice, request a hearing. The hearing shall be conducted by an administrative law judge assigned by the Florida Division of Administrative Hearings. The hearing shall be conducted

within ninety (90) days after receipt of the request for a hearing and in accordance with F.S. Chapter 120. The administrative law judge's final order shall be submitted to the Board. The administrative law judge shall award the prevailing party reasonable attorney fees and costs incurred during the administrative proceeding and any appeals. (Neola)

The charter school's governing board may, within thirty (30) calendar days after receiving the final order, appeal the decision pursuant to F.S. 120.68.

**A charter may be terminated immediately if the Board sets forth in writing the particular facts and circumstances indicating that an immediate and serious danger to the health, safety, or welfare of the charter school's students exists.** The Board's determination is subject to the procedures set forth in F.S. 1002.33(8)(b) and (c), except that the hearing may take place after the charter has been terminated. The Board shall notify in writing the charter school's governing board, the charter school principal, and FLDOE if a charter is terminated immediately. The Board shall clearly identify the specific issues that resulted in the immediate termination and provide evidence of prior notification of issues resulting in the immediate termination when appropriate. Upon receiving written notice from the board, the charter school's governing board has ten (10) calendar days to request a hearing. (Neola) A requested hearing must be expedited and the final order must be issued within sixty (60) days after the date of request. The Board shall assume operation of the charter school throughout the pendency of the hearing unless the continued operation of the charter school would material threaten the health, safety, or welfare of the students.

**Charter School Obligations Upon Initial Notification of Non-Renewal, Closure, or Termination of a Charter**

Upon initial notification of non-renewal, closure, or termination of its charter, a charter school may not expend more than $10,000 per expenditure without prior written approval from the District unless such expenditure was included within the annual budget submitted to the District pursuant to the charter contract, is for reasonable attorney fees and costs during the pendency of any appeal, or is for reasonable fees and costs to conduct an independent audit.

An independent audit shall be completed within thirty (30) days after notice of non-renewal, closure, or termination to account for all public funds and assets.

A provision in a charter contract that contains an acceleration clause requiring the expenditure of funds based upon closure or upon notification of non-renewal or termination is void and unenforceable.

A charter school may not enter into a contract with an employee that exceeds the term of the school's charter contract with the District.

A violation of this section triggers a reversion or clawback power by the District allowing for collection of an amount equal to or less than the accelerated amount that exceeds normal

expenditures. The reversion or clawback **plus legal** fees and costs shall be levied against the person or entity receiving the accelerated amount.

**Charter Contract and Contract Negotiation Process**

A standard charter contract shall be consistent with this policy and approved by the Contract Review Team to be used as the basis for all charters approved under this policy. All contracts and contract amendments, as approved by the Contract Review Team (CRT), must be presented to the Board for approval. The charter contract must contain all information set forth in the Florida Standard Charter Contract Form prescribed by the FLDOE. (Neola)

A. Initial Charter Contract

1. Initial contract shall be for a term of five (5) years unless a longer term is specifically required by law.

2. Before a recommendation regarding whether or not the Board should approve an initial contract, evidence of the following shall be provided: a. Evidence of a proper legal structure (e.g., articles of incorporation, bylaws, municipal charter). The applicant shall be a not for profit organized pursuant to F.S. Chapter 617. b. Except for virtual charter schools, actual location and evidence that a facility has been secured for the term of the charter, or a deadline for submitting evidence that a facility has been secured. Evidence should include, but is not limited to: 1) letter of intent from the landlord or mortgagee indicating property usage and term of occupancy; 2) executed lease or certification of occupancy; and/or 3) use or occupational license indicating proper use. All facilities must meet the requirements set forth in F.S. 1002.33.

B. Charter Contract Negotiations — The Board shall have thirty (30) days after approval of an application to provide an initial proposed charter contract to the charter school. The applicant and the Board shall have forty (40) days thereafter to negotiate and notice the charter contract for final approval by the Board unless both parties agree to an extension. The proposed charter contract shall be provided to the charter school at least seven (7) calendar days prior to the date of the meeting at which the charter is scheduled to be voted upon by the Board. The Department of Education shall provide mediation services for any dispute regarding this section subsequent to the approval of a charter application and for any dispute relating to the approved charter, except disputes regarding charter school application denials. If the Commission of Education determines that the dispute cannot be settled through mediation, the dispute may be appealed to an administrative law judge appointed by the Florida Division of Administrative Hearings. The administrative law judge has final order authority to rule on issues of equitable treatment of the charter school as a public school, whether proposed provisions of the charter violate the intended flexibility granted charter schools by statute, or on any other matter regarding this section except a charter school application denial, a charter termination, or a charter nonrenewal and shall award the prevailing party reasonable

attorney's fees and costs incurred during the mediation process, administrative proceeding, and any appeals to be paid by the losing party.

## C. Request to Extend Negotiations/School Opening

1. The applicant and Board may mutually agree to extend the statutory timeline to negotiate and consider approval of the charter contract for a period not to exceed one (1) year from the approved opening date in the charter school application. Requests shall be submitted, in writing, to the Office of Charter Schools by an authorized agent of the charter school, detailing the reason for the requested extension.

2. In the event that the statutory timeline to negotiate and enter into a charter contract is extended, the applicant shall update its charter school application prior to resuming negotiations with regard to: (1) updated budget; and (2) applicable application revisions necessitated by the delay.

3. The application shall be automatically rescinded, without further action by the Board, if the applicant does not enter into contract negotiations or open the school within: (1) the timeframe specified by law, or (2) the date of extension which has been mutually agreed upon in writing by both parties.

4. Upon approval of an application, the initial startup shall commence with the beginning of the Board's school calendar. A charter school may defer the opening of the school's operations for up to three (3) years to provide time for adequate facility planning. The charter school must provide written notice of such intention to the Board and the parents of enrolled students at least thirty (30) calendar days before the first day of school. In the event that the opening of the approved applicant's charter school is deferred, the applicant shall update its charter school application prior to the opening of the charter school with regard to: (1) updated budget; and (2) applicable application revisions.

5. An approved contract shall be automatically revoked, without further action by the Board, if the applicant does not open the school: a. on the first day of school of the initial school year indicated in the contract; or b. on the first day of the school year indicated in the approved deferral.

## D. Charter Contract Amendments/Modifications

1. A charter may be modified during its initial term or any renewal term upon the recommendation of the Board or the charter school's governing board and the approval of both parties to the agreement. All modifications must be mutual and in writing. Unilateral modification made by the charter school is grounds for termination or non-renewal. Modification during any term may include, but is not limited to, consolidation of multiple charters into a single charter if the charters are operated under the same governing board,

regardless of the renewal cycle. A charter school that is not subject to a school improvement plan and that closes as part of a consolidation shall be reported by the District as a consolidation.

2. Modifications may be considered by the Board for a number of reasons, which may include, but is not limited to, protect the health, safety, or welfare of the students.

3. All contract amendment requests shall be submitted in writing to the Office of Charter Schools by an authorized agent of the charter school. Additional information or documentation may be requested for consideration of any amendment requests.

4. The charter school shall provide evidence of governing board approval for all proposed amendments (e.g., governing board resolution, governing board meeting minutes).

5. Requirements for Amendment Requests [including Education Program Amendments, Location Amendments, and Enrollment Capacity Amendments as detailed in the full policy]

6. When a contract is amended or renewed, it shall be updated to comply with this policy and the current standard charter contract.

**Controlled Open Enrollment** — If a charter school in the District chooses to offer controlled open enrollment, the charter school shall comply with all Florida controlled open enrollment laws (F.S. 1002.31). (Neola)

**Pre-Opening Requirements** — No later than thirty (30) days prior to the initial use of the facility by the school, the school shall have an approved contract and provide evidence of all necessary permits, licensing, zoning, use approval, facility certification and other approvals required for use of the facility by the local government. (Neola) Failure to comply may result in automatic rescission of the contract, with no further action by the Board. A certificate of occupancy or a temporary certificate of occupancy must be provided to the Board no later than fifteen (15) calendar days before the first day of school.

**School Governance/Management**

A. Charter schools shall organize or be operated by a not for profit organized pursuant to F.S. Chapter 617, a municipality, or another public entity, as provided by law.

B. Charter School's Governing Board Requirements [including requirements for parental involvement representative, public meetings, background checks, governance training, dispute procedures, and conflict resolution]

C. Management Companies [including requirements for contract review, amendments, oversight, and prohibitions on employees/relatives serving on governing board]

D. Voluntary Closure of Charter School [procedures for voluntary closure including public meeting, notification, and dissolution requirements]

**Employees of Charter Schools**

A charter school shall employ or contract with employees who have undergone background screening as provided in F.S. 1012.32. Members of the governing board of the charter school shall also undergo background screening in a manner similar to that provided in F.S. 1012.32 upon appointment to the governing board.

A charter school shall disqualify instructional personnel and school administrators, as defined in F.S. 1012.01, from employment in any position that requires direct contact with students if the personnel or administrators are ineligible for such employment under F.S. 1012.315.

[Anti-nepotism provisions, ethical conduct standards, mandatory reporting requirements for misconduct affecting health/safety/welfare of students, prohibition on confidentiality agreements regarding misconduct, employment history check requirements]

The Board shall terminate a charter school that knowingly fails to comply with F.S. 1002.33(12)(g).

**School Operations**

A. The Board shall not impose any policies or practices to limit charter school enrollment except as may be permitted in accordance with State law.

B. The Board may document, in writing, any discrepancies or deficiencies—whether fiscal, educational, or related to school climate—and the steps and timelines for correction and additional monitoring.

C. [Facility capacity requirements]

D. [Calendar requirements]

E. Student Code of Conduct, Student Handbooks, and Parent Contracts and Application of Board Policies

1. Only the Board may expel a student.
2. The charter school may follow the Board's Student Code of Conduct or an alternate code of conduct approved by the Board. 3-5. [Parent contract requirements and violations]
3. **The Board shall not apply its policies to a charter school unless mutually agreed to by both the Board and the charter school.** If the Board subsequently amends any agreed-upon Board policy, the version of the policy in effect at the time of the execution of the charter, or any subsequent modification thereof, shall remain in effect and the sponsor may not hold the charter school responsible for any provision of a newly revised policy until the revised policy is mutually agreed upon.

F-G. [Food Service, Transportation, and Facility Leases]

H. Academic Accountability [including school improvement plans, corrective actions, ESE requirements, ELL requirements]

I. Financial Accountability [comprehensive financial reporting, audit, capital outlay, and review requirements]

J. Charter School Website [public transparency requirements]

**Board Annual Report Submission** [requirements for annual reporting to FLDOE]

**Services** [administrative and educational services, fee structure calculations]

**Nonexclusive Interlocal Agreements** [provisions for interlocal agreements with governmental entities]

**Interpretation** — If a court or agency of competent jurisdiction invalidates any provision of this policy or finds a specific provision to be in conflict with the Florida Constitution, Florida statutes, the Florida Administrative Code, or any rule or policy prescribed by FLDOE, then all of the remaining provisions of this policy shall continue unabated and in full force and effect.

In the event that an existing charter school contract provision is found to be inconsistent with this policy, the charter contract provision prevails. Any charter approved after the adoption of this policy is required to be fully consistent with this policy.

**Legal References:** F.S. 39.203; F.S. Chapter 120; F.S. 218.39; F.S. 218.391; F.S. 218.503; F.S. 286.23; F.S. 768.095; F.S. 1001.10(5); F.S. 1001.41; F.S. 1002.31; F.S. 1002.33; F.S. 1002.345; F.S. 1008.31; F.S. 1008.34; F.S. 1011.60; F.S. 1012.01; F.S. 1012.315; F.S. 1012.32; F.S. 1013.12; Chapter 96-186(1) Laws of Florida; F.A.C. 6A-1.0081; F.A.C. 6A-1.099827; F.A.C. 6A-2.0020; F.A.C. 6A-6.0781; F.A.C. 6A-6.0784; F.A.C. 6A-6.0786; F.A.C. 6A-6.07862; F.A.C. 6A-6.0787; F.A.C. 6A-6.0788; FLDOE Forms IEPC-M1, IEPC-M2, IEPC-SC, IEPC-VI, IEPC-V2, IEPC-M1A

Revised 10/28/14; Revised 11/15/16; Revised 1/22/19
© Neola 2018

---

## Policy 9150 — SCHOOL VISITORS

**Full Title:** 9150 - SCHOOL VISITORS **Code:** po9150 **Section:** 9000 Community Relations
**Original Adoption:** November 12, 2013 **Last Revision:** Revised 1/22/19 **Neola Copyright:** © Neola 2017 **Source URL:** https://files.neola.com/polk-fl/search/policies/po9150.htm

**Complete verbatim text:**

**9150 - SCHOOL VISITORS**

The School Board welcomes and encourages visits to school by parents, other adult residents of the community, and interested educators. But in order for the educational program to continue undisturbed when visitors are present and to prevent the intrusion of disruptive persons into the schools, it is necessary to invoke visitor controls.

**The control of the school is vested in the Principal who has the ultimate responsibility for the administrative and supervision of all decisions and activities on the school campus.** The Principal has the authority to prohibit the entry of any person to a school of this District or to expel any person when there is reason to believe the presence of such person would be detrimental to the good order of the school. If such an individual refuses to leave the school grounds or creates a disturbance, the Principal is authorized to request from the local law enforcement agency whatever assistance is required to remove the individual. The Principal also has the right to control the time of day, length of the visit, and to determine if the parent is to be accompanied.

**Unauthorized presence on school premises is strictly prohibited and considered trespassing under F.S. 810.097.** All visitors desiring access to school premises must first receive permission from the Principal, sign in and out at the school office, and wear a visitor's nametag while present on school premises. Persons desiring to meet with a teacher or student on school premises must arrange for an appointment through the Principal.

Except for animals in the classroom as regulated by Policy 8390, canines brought on the premises by law enforcement personnel for law enforcement purposes, or service animals required for use by a person with a disability, or animals brought on campus for curricular or extra-curricular purposes and approved in writing by the Principal, school visitors may not bring any animals on school premises at any time.

Parents and guardians desiring to visit their child during the school day on school premises must follow the procedures set forth above. Non-custodial parents may not remove the child from the school without the lawful consent of the custodial parent or guardian or legal authorization in the form of an order or judgment of a court of competent jurisdiction.

Observation of a teacher's class by a parent or guardian shall be allowed only after receiving the building principal's consent and providing a twenty-four (24) hour notice, unless the teacher to be observed agrees to less notice.

The Superintendent shall promulgate such administrative procedures as are necessary for the protection of students and employees of the District from disruption to the educational program or the efficient conduct of their assigned tasks.

Rules regarding entry of persons other than students, staff, and faculty upon school grounds or premises shall be posted conspicuously at or near the entrance to such grounds or premises if there are no formal entrances, and at the main entrance to each school building. In addition, the

rules shall be posted in a central location in each school and made available to students, upon request.

**Visitation by Board Members**

Individual Board members may visit a District school at any time. Board members may not be required to give prior notice of the visit. Another Board member or District employee may not limit the duration or scope of the visit or direct a visiting Board member to leave the premises.

The Board member must sign in and sign out at the school's main office and wear his/her Board identification badge at all times while present on school premises.

The Board member shall be visiting as an interested individual in a similar capacity to any parent or citizen of the community. These visits should not be considered to be inspections nor as supervisory in nature.

If, during a visit to a school or program, a Board member observes a situation or condition which causes concern, s/he should discuss the situation first with the principal and the Superintendent as soon as convenient or appropriate. Such a report or discussion shall not be considered an official one from the Board.

If the Board member believes the situation or condition serious enough, s/he may wish to also inform the Superintendent.

Revised 1/22/19
© Neola 2017

---

## Policy 8405 — SCHOOL SAFETY AND SECURITY

**Full Title:** 8405 - SCHOOL SAFETY AND SECURITY **Code:** po8405 **Section:** 8000 Operations **Original Adoption:** November 12, 2013 **Revision History:** Revised 12/13/16; Revised 9/4/18; Revised 7/30/19; Technical Correction 8/20/19 **Neola Copyright:** © Neola 2019 **Source URL:** https://files.neola.com/polk-fl/search/policies/po8405.htm

**Complete verbatim text:**

**8405 - SCHOOL SAFETY AND SECURITY**

The School Board is committed to maintaining a safe and drug-free environment in all of the District's schools.

School crime and violence are multifaceted problems that need to be addressed in a manner that utilizes all available resources in the community through a coordinated effort of School District personnel, law enforcement agencies, first responders, and families. The Board further believes that school administrators and local law enforcement officials must work together to

provide for the safety and welfare of students while they are at school or a school-related event or are on their way to and from school. The Board also believes that the first step in addressing school crime and violence is to assess the extent and nature of the problem(s), and then plan and implement strategies that promote school safety and minimize the likelihood of school crime and violence.

The Superintendent, in conjunction with the School Safety Specialist, shall develop a *Critical Incident Response Plan* with input from representatives of the local law enforcement agencies; the local Fire Marshall(s) or his/her designee(s); representative(s) from emergency medical services; building administrators; representative(s) from the local emergency management agency; School Resource Officer(s); School Safety Guardians; Safe Schools Department; and/or Specialized Services Department.

Included within the District's Critical Incident Response Plan shall be a District Active Assailant Response Plan (DAARP). The DAARP shall include, at a minimum, procedures addressing the following:

A. security assessments;
B. roles and responsibilities of District personnel;
C. roles and responsibilities of Safe-School Officers (Policy 8407 - Safe-School Officers);
D. information sharing;
E. training of District personnel and exercises/drills, including training standards;
F. identification of Safe Spaces and Command Posts;
G. response to the threat of an active assailant;
H. response to the presence of an active assailant on school grounds;
I. communication with law enforcement prior to and after law enforcement arrives on school grounds;
J. responsibilities prior to law enforcement arrival;
K. responsibilities when law enforcement arrives on school grounds;
L. communication with the public; and
M. post-incident recovery.

The District will adopt its initial DAARP by October 1, 2019, and annually thereafter.

Further, by October 1st of each year, the Superintendent shall certify to the Office of Safe Schools that all school personnel has received annual training on the procedures contained in the District's DAARP.

**School Safety Specialist**

**The Superintendent is responsible for designating the District's School Safety Specialist.** The School Safety Specialist must be a school administrator employed by the District or a law enforcement officer employed by the Polk County Sheriff's Office. **The School Safety Specialist is responsible for the supervision and oversight for all school safety and security personnel,**

**policies, and procedures in the District.** The School Safety Specialist's responsibilities include, but are not limited to, the following:

A. reviewing District policies and procedures for compliance with Florida law and applicable rules, including the District's timely and accurate submission of school environmental safety incident reports to the Department pursuant to F.S. 1001.212;

B. providing necessary training and resources to students and staff in matters relating to youth mental health awareness and assistance; emergency procedures, including active shooter training; and school safety and security;

C. serving as the District liaison with local public safety agencies and national, State, and community agencies and organizations in matters of school safety and security;

D. conduct annually, in collaboration with the appropriate public safety agencies, a school security risk assessment at each District school using the Florida Safe School Assessment Tool developed by the Office of Safe Schools;

The District will report to FLDOE by October 15th of each year that all public schools within the District have completed the assessment using the Florida Safe Schools Assessment Tool. For purposes of this section, "public safety agencies" means a functional division of a public agency which provides firefighting, law enforcement, medical, or other emergency services.

E. coordinating with appropriate public safety agencies, as defined in F.S. 365.171, that are designated as first responders to a school's campus to conduct a tour of such campus once every three (3) years and to provide recommendations related to school safety;

Any changes related to school safety, emergency issues, and recommendations provided by the public safety agencies will be considered as part of the recommendations by the School Safety Specialist to the Board.

F. providing, or arranging for the provision of, youth mental health awareness and assistance training to all school personnel as set forth in F.S. 1012.584.

The training program shall include, but is not limited to, the following: 1) an overview of mental illnesses and substance abuse disorders and the need to reduce the stigma of mental illness; 2) information on the potential risk factors and warning signs of emotional disturbance, mental illness, or substance use disorders, including, but not limited to, depression, anxiety, psychosis, eating disorders, and self-injury, as well as common treatments for those conditions and how to assess those risks; and 3) information on how to engage at-risk students with skills, resources, and knowledge required to assess the situation, and how to identify and encourage the student to use appropriate professional help and other support strategies, including, but not limited to, peer, social, or self-help care.

The District's School Safety Specialist shall earn, or designate one (1) or more individuals to earn, certification as a youth mental health awareness and assistance trainer as set forth in F.S.

1012.584.

## Recommendations of the School Safety Specialist

Based on the findings of the school security risk assessment, the School Safety Specialist must provide recommendations to the Superintendent and Board which identify strategies and activities that the Board should implement in order to address the findings and improve school safety and security. The Board will review the school security risk assessment findings and the recommendations of the School Safety Specialist at a publicly noticed Board meeting to provide the public an opportunity to hear the Board members discuss and take action. The *Critical Incident Response Plan* is, however, confidential and is not subject to review or release as a public record.

The School Safety Specialist shall report the school security risk assessment finding and the Board's action(s) to the Office of Safe Schools no later than thirty (30) days after the Board meeting.

As a part of the *Critical Incident Response Plan*, the Board shall verify that it has procedures in place for keeping schools safe and drug-free that include:

A. safety and security best practices;
B. appropriate and effective school discipline policies that prohibit disorderly conduct, the illegal possession of weapons and the illegal use, possession, distribution, and sale of tobacco, alcohol, and other drugs by students;
C. security procedures at school and while students are on the way to and from school;
D. prevention activities that are designed to maintain safe, disciplined, and drug-free environments;
E. a code of conduct or policy for all students that clearly states the responsibilities of students, teachers, and administrators in maintaining a classroom environment that: 1) allows a teacher to communicate effectively to all students in the class; 2) allows all students in the class the opportunity to learn; 3) has consequences that are fair, and developmentally appropriate; 4) considers the student and the circumstances of the situation; and 5) is enforced accordingly.

**Safety and Security Best Practices** — The Superintendent shall develop administrative procedures for the prevention of violence on school grounds, including the assessment and intervention with individuals whose behavior poses a threat to the safety of the school community.

**Persistently Dangerous Schools** [detailed provisions for reporting, corrective action, and transfer options]

**Victims of Violent Crime** [provisions for transfer options for victims]

**Threat Assessment**

The primary purpose of a threat assessment is to minimize the risk of violence at school. Threat assessment teams are responsible for the coordination of resources and assessment and intervention with individuals whose behavior may pose a threat to the safety of school staff or students consistent with the model policies and procedures developed by the Office of Safe Schools which addresses early identification, evaluation, early intervention, and student support.

A. Location and Membership — Threat assessment teams are located at each school in the District and composed of individuals with expertise in counseling, instruction, school administration, and law enforcement.

B. Responsibilities and Activities of Threat Assessment Teams — Include: 1) identification of individuals for reporting threatening behavior; 2) utilizing the Department's behavior threat assessment instrument; 3) consulting with law enforcement on patterns of threatening behavior; 4) consulting with law enforcement on multiple misdemeanors; 5) reporting preliminary threat determinations to the Superintendent with immediate parent notification; 6) obtaining criminal history record information when threats are identified; 7) creating procedures for engaging behavioral health crisis resources.

C. Sharing of Information — The District and other agencies may share confidential records when reasonably necessary to ensure access to appropriate services or safety.

D. Immediate Mental Health or Substance Abuse Crisis — Procedures for engaging behavioral health crisis resources including mobile crisis teams and trained SROs.

Each threat assessment team shall report quantitative data on its activities to the Office of Safe Schools and shall utilize the threat assessment database developed pursuant to F.S. 1001.212.

**Referral to Mental Health Services** — All school personnel who receive training pursuant to F.S. 1012.584 shall be notified of the mental health services that are available in the District.

**School Environmental Safety Incident Reporting** — The superintendent is responsible for ensuring the accurate and timely reporting of incidents related to school safety and discipline.

**Student Crime Watch Program** — The Board shall implement a Student Crime Watch Program to promote responsibility among students and improve school safety.

**Promotion of School Safety Awareness** — The Board shall promote the use of the Florida Department of Education's mobile suspicious reporting tool ("FortifyFL") on the District's website, in newsletters, on school campuses, and in school publications.

F.S. 1006.07; F.S. 1006.13; F.S. 1006.1493; Florida Safe Schools Assessment Tool; Threat Assessment in Schools: A Guide to Managing Threatening Situations and to Creating Safe School Climates (U.S. Secret Service and U.S. Department of Education)

Revised 12/13/16; Revised 9/4/18; Revised 7/30/19; Technical Correction 8/20/19

© Neola 2019

---

## Policy 8407 — SAFE-SCHOOL OFFICERS

**Full Title:** 8407 - SAFE-SCHOOL OFFICERS **Code:** po8407 **Section:** 8000 Operations **Original Adoption:** September 4, 2018 **Last Revision:** Revised 7/30/19 **Neola Copyright:** © Neola 2018 **Source URL:** https://files.neola.com/polk-fl/search/policies/po8407.htm

**Complete verbatim text:**

**8407 - SAFE-SCHOOL OFFICERS**

**For the protection and safety of students, school personnel, visitors, and property, the District shall partner with local law enforcement agencies to establish or assign one or more safe-school officers at each school in the District, including charter schools.**

Further, the Board will collaborate with charter school governing boards located in the District to facilitate access to all safe-school officer options available pursuant to Florida law.

**School Resource Officers**

The School Board will enter into cooperative agreements with law enforcement agencies for the provision of school resource officers. School resource officers must be certified law enforcement officers as defined in F.S. 943.10(1) and employed by a law enforcement agency as defined in F.S. 943.10(4). School resource officers shall:

A. undergo criminal background checks, drug testing, and a psychological evaluation;
B. abide by Board policies and consult with and coordinate activities through school principals; and
C. complete mental health crisis intervention training using a curriculum developed by a national organization with expertise in mental health crisis intervention. Such training must be designed to improve school resource officers' knowledge and skills as first responders to incidents involving students with emotional disturbance or mental illness, including de-escalation skills to ensure student and officer safety.

With respect to matters relating to employment, school resource officers shall be responsible to their law enforcement agency, subject to agreements between the Board and law enforcement agency. Activities conducted by school resource officers which are part of the regular instructional program of schools shall be under the direction of school principals.

The powers and duties of law enforcement officers shall continue throughout school resource officers' tenure.

**School Safety Guardians (The Coach Aaron Feis Guardian Program)**

The Board may utilizes school guardians pursuant to The Coach Aaron Feis Guardian Program. The Superintendent shall be responsible for appointing school guardians.

School guardians do not have the power of arrest or the authority to act in any law enforcement capacity except to the extent necessary to prevent or abate an active assailant incident.

In support of school-sanctioned activities for purposes of F.S. 790.115, the following individuals may serve as a school guardian:

A. a District employee or personnel as defined under F.S. 1002.01 who volunteers to serve as a school guardian in addition to his/her official job duties; or
B. a District employee who is hired for the specific purpose of serving as a school guardian.

Prior to appointing school guardians, the Superintendent must verify through evidence provided by the Polk County Sheriff that potential school guardians have met all the requirements set forth in F.S. 30.15.

**Notification of Incidents Involving Safe-School Officer Discipline and Firearm Discharge**

The Superintendent is responsible for notifying the Polk County Sheriff immediately after, but no later than seventy-two (72) hours after, the occurrence of the following:

A. a Safe-School Officer is dismissed for misconduct or disciplined; and
B. a Safe-School Officer discharges his/her firearm in the exercise of his/her duties other than for training purposes.

F.S. 30.15; F.S. 1006.12

Adopted 9/4/18; Revised 7/30/19
© Neola 2018

---

# Policy 8141 — MANDATORY REPORTING OF MISCONDUCT BY CERTIFICATED EMPLOYEES

**Full Title:** 8141 - MANDATORY REPORTING OF MISCONDUCT BY CERTIFICATED EMPLOYEES **Code:** po8141 **Section:** 8000 Operations **Original Adoption:** November 12, 2013 **Last Revision:** No revision (unchanged since adoption) **Neola Copyright:** © Neola 2008 **Source URL:** https://files.neola.com/polk-fl/search/policies/po8141.htm

**Complete verbatim text:**

**8141 - MANDATORY REPORTING OF MISCONDUCT BY CERTIFICATED EMPLOYEES**

The School Board recognizes its responsibilities to effectively address employee misconduct and, where determined appropriate, to provide a measured disciplinary response consistent with due process. In addition, with respect to certificated and/or certificated professional staff members, matters of misconduct, including conviction of certain crimes enumerated by law and/or conduct which is unbecoming to the teaching profession, will be reported by the Superintendent to the Florida Department of Education.

**Reporting Professional Misconduct**

**District staff are required to report to the Superintendent alleged misconduct by District employees which affects the health, safety, or welfare of a student.**

If the alleged misconduct to be reported is regarding the Superintendent, the District employee shall report the alleged misconduct to the Board attorney. Failure to report such alleged misconduct shall result in appropriate disciplinary action (F.S. 1012.796(d)). The report shall be made in accordance with Policy 9130 - Public Complaints.

The Superintendent shall investigate any allegation of misconduct by District employees which affects the health, safety, or welfare of a student, and shall report the alleged misconduct to the Department of Education as required in F.S. 1012.796, 1001.51(12)(b), 1001.42(7)(b).

Staff alleged to have committed such misconduct shall be reassigned pending the outcome of a misconduct investigation.

**Filing a Complaint with the Department of Education**

If it is alleged that an instructional staff member or administrator has committed a violation as provided in F.S. 1012.795, and defined by rule of the State Board of Education, the Superintendent shall file with the Department of Education a legally sufficient complaint within thirty (30) days after the date on which the subject matter of the complaint came to the attention of the Superintendent. A complaint is legally sufficient if it contains ultimate facts that show a violation has occurred as provided in F.S. 1012.795 and defined by rule of the State Board of Education. The Superintendent shall include all known information relating to the complaint with the filing of the complaint. This paragraph does not limit or restrict the power and duty of the Department of Education to investigate complaints, regardless of the District's untimely filing, or failure to file, complaints and follow-up reports (F.S. 1012.796(e)).

**Report of Resignation or Termination**

If the Superintendent determines that misconduct by an instructional staff member or an administrator who holds a certificate issued by the Florida Department of Education affects the health, safety, or welfare of a student and the misconduct warrants termination, the staff member may resign or be terminated and the Superintendent must report the misconduct to the Department of Education in the format prescribed by the Department. The Department

shall maintain each report of misconduct as a public record in the instructional personnel's certification files (F.S. 1012.796(d)).

## Transmittal of False or Incorrect Report

The Superintendent shall not knowingly sign and transmit to any State official a report that the Superintendent knows to be false or incorrect.

Pursuant to F.S. 1001.42(7), a Board member may not knowingly sign and transmit to any State official a report of alleged misconduct by instructional personnel or school administrators which affects the health, safety, or welfare of a student which the Board member knows to be false or incorrect.

## Requirement of Disclosure of Employee Misconduct

**The Board, Superintendent, or any other District employee, may not enter into a confidentiality agreement regarding terminated or dismissed instructional personnel or school administrators, or personnel or administrators who resign in lieu of termination, based in whole or in part on misconduct that affects the health, safety, or welfare of a student,** and may not provide instructional personnel with employment references or discuss the personnel's performance with prospective employers in another educational setting, without disclosing the personnel's or administrators' misconduct. Any part of an agreement or contract that has the purpose or effect of concealing misconduct by instructional personnel which affects the health, safety, or welfare of a student is void, is contrary to public policy, and may not be enforced (F.S. 1001.42(6)).

## Posting Requirements

Pursuant to F.S. 1006.061(2), this policy shall be posted in a prominent place at each school site and on each school's internet website, so that the policy and procedures for reporting alleged misconduct by instructional personnel or school administrators which affects the health, safety, or welfare of a student; the contact person to whom the report is made; and the penalties imposed on instructional personnel or school administrators who fail to report suspected or actual child abuse or alleged misconduct by other instructional personnel or school administrators is effectively communicated to all.

F.S. 1001.42(6), 1001.42(7)(b), 1001.51(12)(b), 1006.061(2), 1012.795; F.S. 1012.796, 1012.796(d), 1012.796(e)

© Neola 2008

_____

## McKeel Academy charter contract and case information

**The specific charter contract between The School Board of Polk County and The Schools of**

**McKeel Academy, Inc. is not publicly available online.** Extensive searching of the Polk County Public Schools website, BoardDocs portal, Florida DOE databases, and public document repositories yielded no publicly posted copy.

To obtain the contract, counsel should:

- **File a Florida Public Records Act request** (Ch. 119, F.S.) with the Polk County School Board, Office of Charter Schools, 1915 S. Floral Ave, Bartow, FL 33830, Phone: 863-534-0625

- **File a parallel request with McKeel Academy** which has a custodian of public records pursuant to F.S. §119.12(2)

- **Search BoardDocs meeting agendas** at go.boarddocs.com/fl/polk/Board.nsf/Public for board action items approving or renewing the McKeel charter

- **Check PACER** for case filings in 8:25-cv-02479-WFJ-TGW that may include the contract as an exhibit

McKeel Academy background: Founded 1998 as Florida's first secondary conversion charter school; operated by The Schools of McKeel Academy, Inc. (non-profit); currently operates McKeel Academy of Technology (7-12), McKeel Academy Central (PK-6), South McKeel Academy (PK-6), plus a new campus in Mulberry approved June 2025; designated as a "high-performing charter school system" by the Florida DOE in 2011; enrollment approximately 3,280+ students.

The Florida Standard Charter Contract template (Form IEPC-SC, Rule 6A-6.0786, F.A.C.) is available at https://www.fldoe.org/core/fileparse.php/7700/urlt/IEPC-SC.PDF and contains the mandatory framework provisions that would apply to the McKeel contract, including safety compliance provisions (§1006.12 safe-school officers, Marjory Stoneman Douglas Act compliance), immediate termination authority, and student welfare complaint procedures with **seven calendar day** resolution requirements.

---

## Key provisions across policies most relevant to the case

Several interconnected provisions establish the School Board's authority structure over charter schools in safety and visitor matters:

**Policy 9800** establishes that the Board has **"oversight responsibility for all charter schools situated within Polk County"** under F.S. 1002.33, with **"final authority, by majority vote"** over charter applications and contracts, and the power to **immediately terminate** any charter upon written finding of **"immediate and serious danger to the health, safety, or welfare of the charter school's students."** Section E.6 provides that Board policies do not apply to charter

schools unless mutually agreed upon—a key provision that may bear on whether Policies 8405 and 8407 apply to McKeel.

**Policy 8407** expressly applies to charter schools in its first operative sentence: the District shall assign safe-school officers **"at each school in the District, including charter schools."**

**Policy 8405** establishes the **School Safety Specialist** role with **"supervision and oversight for all school safety and security personnel, policies, and procedures in the District"** and mandates threat assessment teams at each school, annual security risk assessments, and the DAARP.

**Policy 9150** vests campus control in the **Principal,** who has authority to **"prohibit the entry of any person to a school of this District or to expel any person"** and explicitly references **F.S. 810.097** (trespass on school property).

**Policy 8141** requires mandatory reporting of misconduct affecting student health, safety, or welfare, prohibits confidentiality agreements covering such misconduct, and requires reassignment pending investigation.

> **Note on December 2025 revision of Policy 9800:** If the Board adopted a December 9, 2025 revision adding explicit cross-references to Policies 8405 and 8407 and requiring charter school coordination with the School Safety Specialist, this would close the gap created by Section E.6 (which currently states policies don't apply to charters unless agreed upon) by making safety coordination a direct charter policy requirement rather than relying on mutual agreement. Counsel should obtain this revised version from the district for exhibit purposes.